[Argued January 23; decided March 12, 1894.]

## JOHNSON *v.* JOHNSON.
[S. C. 36 Pac. Rep. 161.]

APPEAL from Benton: J. C. FULLERTON, Judge.

Defendant appeals.                              AFFIRMED.

*Messrs. John Kelsay* and *J. J. Daly*, for Appellant.

*Mr. W. S. McFadden*, for Respondent.

PER CURIAM.

This is a suit brought by M. F. Johnson against J. L. Johnson for divorce. She charges him with desertion

and cruel treatment, which he denies, and charges plaintiff with having committed adultery with divers persons. The plaintiff, after denying the new matter in the answer, alleges in her reply that the defendant associated with prostitutes, and committed adultery with certain persons. The cause was referred to take the testimony, and upon the report thereof the court found that the equities were with the plaintiff, decreed a dissolution of the marriage contract, awarded plaintiff the undivided one third of defendant's real property, and her costs and disbursements, from which he appeals. The evidence, in our judgment, shows that the allegations of the complaint and reply have been fully established, and, unless the plaintiff's conduct has been such as to bar her right to equitable relief, the decree should be affirmed.

The record shows that the parties were married December twenty-fifth, eighteen hundred and seventy-two, and appeared to live happily until about January, eighteen hundred and eighty-one, when the plaintiff desired to visit her mother, then living in Northern California, whom she had not seen for about seven years. The defendant objected to this proposed visit, which led to some difficulty between them, and the plaintiff, in order to secure the means to make the journey, executed and delivered to the defendant a quit-claim deed purporting to convey to him, in consideration of three hundred dollars, her right, title, and interest in and to his real property. Upon the receipt of said sum she visited her mother, and remained with her until about June, when the defendant went after her and took her home. The defendant seeks to prove that the plaintiff's motive in making the journey was not to visit her mother, but to accompany one J. R. Beggs, a school teacher, who boarded with the parties to this suit. William Burns, a nephew of the defendant, then thirteen years of age, testified that

Beggs was boarding at his uncle's, in the winter of eighteen hundred and eighty-one; he staid there while his uncle was away from home, attending court, and that he saw the plaintiff and Beggs exchanging written notes with each other. The defendant testified that Beggs left about the time plaintiff went away, and that he saw in the Oregonian a list of passengers by steamer from Portland to San Francisco in which the names of plaintiff and said Beggs appeared. The plaintiff, in explaining the written notes which the witness Burns saw, testified that Beggs had set a copy of capital letters for her, which she tried to imitate; that she never saw Beggs after she left home in January, and that if he was a passenger on the steamer with her she never knew it. A copy of the passenger list of the steamer State of California, as published in the daily Oregonian, February eleventh, eighteen hundred and eighty-one, certified to by H. L. Pittock, manager of said paper, was offered in evidence, in which plaintiff's name appeared as one of the passengers, but it did not contain the name of said Beggs. This paper was not properly authenticated, and, as offered, was not admissible.

The record further shows that the plaintiff lived with the defendant from the time she returned, in June, eighteen hundred and eighty-one, until the fall of eighteen hundred and eighty-two, at which time, as she testified, he pulled her out of bed, beat and choked her, and brandished a revolver about her head, when she again left home in consequence of such treatment, and remained away about two years, supporting herself by dressmaking at McMinnville and Portland. The defendant tried to show that in leaving home at this time she was prompted by a desire to be with one Charles Stafford, and the witness Burns testified in his behalf that Stafford was employed as a laborer by his father, who

lived about one mile from the home of plaintiff; that she frequently visited their house while Stafford was there, and that they seemed to desire to get by themselves to talk whenever they could; that at one time the plaintiff started from his father's house towards her home, and Stafford, who was hauling wood from the direction she was going, followed her with his team in about one half hour; that about one half hour after Stafford left he went in the same direction after the cows, and found Stafford's team standing at the edge of the road but did not see either party. The plaintiff testified that she did not meet or see Stafford on that occasion. The evidence also shows that in eighteen hundred and eighty-two the plaintiff accompanied Stafford to a dance, and the next day went with him to the home of her brother-in-law, where they arrived about eleven o'clock in the forenoon. The defendant testified that he attended this dance, and, though he requested the plaintiff, she refused to dance with him, and went to supper with Stafford. The plaintiff testified that she was staying at the home of a friend where there were quite a number of young people going to the dance, who invited her to accompany them; that she promised to go if she could be taken to the home of her brother-in-law the next day; that Stafford promised to take her there, and for that reason she went to the dance; that she danced with the defendant two or three times that evening, and the next day rode to her brother-in-law's with Stafford, and that she never rode with him at any other time.

She also testified that in the fall of eighteen hundred and eighty-four, at the defendant's request, she returned to live with him; that the following spring they moved to Corvallis, where the defendant engaged in the livery business, and she kept a lodging-house, he paying the rent and furnishing the fuel; that in the spring of eigh-

teen hundred and eighty-nine he refused to pay the rent, and in May she moved to Portland, where she kept a lodging-house until July, when at his request she returned. The defendant seeks to show that plaintiff's motive for leaving at this time was a desire to be with one Jehiel Stewart. E. A. Thayer testified that he was acquainted with and saw the plaintiff and said Stewart enter a small cottage on Ninth Street, in Portland, in a respectable neighborhood of that city. The plaintiff and Stewart both testified that they never met or saw each other in Portland. The plaintiff, when she was returning from Portland, in July, eighteen hundred and eighty-nine, was taken sick on the train, having been paralyzed in her hand and arm, and the defendant, upon receiving a telegram from the conductor, met her at the depot upon the arrival of the train, and took her to the hotel; that she remained at the hotel for some time, and then went to the home of G. W. Bigham and wife, who kept a restaurant in Corvallis. Mrs. Bigham testified that while the plaintiff was staying with her she requested the witness to permit said Stewart to come into the house at night, by the back gate from the alley, and to prepare a bed for him on a lounge in an adjoining room having a door between it and plaintiff's room; that she arranged the gate and lounge as requested, and presumed that Stewart came, because she saw him leaving the house at eleven o'clock the next morning. Bigham also testified that after the plaintiff had been at his place nearly seven weeks, she returned to the Mason House in said city; that he took meals to her from his restaurant, and that at plaintiff's request he placed a chair outside her window, that Stewart might enter her room; that she told him to see Stewart and send him to her; that he met Stewart the next morning, and told him what he had done, and Stewart said he had been there and seen

her; that plaintiff requested him to keep the matter a secret; that for a period of about two weeks after she left his restaurant he carried notes to and from the plaintiff and Stewart.

It must be admitted that these witnesses were very accommodating persons. Mrs. Bigham, a married woman, was willing to open the back gate to admit Stewart, and arrange a lounge in her house for his accommodation, and her husband was equally willing to arrange a chair that he might enter the plaintiff's room, and then notify Stewart of what he had done. These witnesses testify that when plaintiff came to their home Stewart agreed to pay them for her board, and that because of this promise, and of the plaintiff's request, they were willing to extend these little courtesies. The evidence shows that the windows of the room plaintiff occupied at the Mason House at the time it is claimed Bigham arranged the chair for Stewart's visits were in plain view of the public, and, to say the least, it seems highly improbable that plaintiff would advertise his visits in this open manner. It appears also that the defendant roomed with the Bighams about three months just prior to the trial, and settled the plaintiff's old board bill, which they say Stewart refused to pay. These circumstances doubtless generated a friendly feeling in the Bighams for the defendant, and corresponding antipathy toward the plaintiff, and may account for their decided leaning to the defendant's side of the case. The record shows that G. W. Bigham, on November sixteenth, prior to the trial, made an affidavit, in which, after deposing that he arranged the chair as above stated, said: "And I did the same thing a few days afterwards at her request. The plaintiff told me, the second time that I put out the chair for her, that she was expecting Jehiel Stewart there to stay with her that night and that was the way he came in." In the cross-examination of this

witness he testified that he arranged the chair but once, and when his attention was called to the fact that, in his affidavit, he had sworn that he arranged the chair more than once, explains the discrepancy by saying: "The first time that I placed the chair is just as you have it there. I had taken the meal over, is the way I came to do that. As regards to the chair being placed there afterwards I do not remember of stating anything of the kind; think it must have been a mistake of the copy." Here is an admission that the affidavit, deliberately made by him, was false, in stating that he arranged the chair at the window more than once. He had probably forgotten what he stated in the affidavit, and hence the conflict in his testimony. The maxim, *falsus in uno, falsus in omnibus,* may well be applied to the testimony of this witness.

The plaintiff testifies that in September, eighteen hundred and ninety, the defendant, being intoxicated, assaulted and beat her, knocking her down upon the floor; that he put his knee upon her, scratched her face, and blacked her eye. One of her witnesses testified that she saw the defendant go to the plaintiff's house, and in a short time the plaintiff came to her house crying, her face bleeding and her throat scratched. The physician who waited upon the plaintiff at this time corroborates her witness as to the scratches, blows, and bruises upon her head and face. This was the last punishment inflicted upon the plaintiff by the defendant, and from that time he slept in his stable. The record shows that at the time of the marriage the defendant had a team, and about three hundred dollars in money, and the property he now owns has been acquired since that time; that the plaintiff, except when driven off by his cruel treatment, has assisted him in the accumulation of what he now has, and in equity ought to have a share thereof, and, the court having awarded this to her, the decree is therefore affirmed.                                           AFFIRMED.